(84 South. 262)

LOUISVILLE & N. R. CO. v. NAUGHER.
(8 Div. 186.)

(Supreme Court of Alabama. Nov. 13, 1919.
Rehearing Stricken Dec. 24, 1919.)

1. MASTER AND SERVANT ⟫276(10) — EVI-
DENCE HELD TO JUSTIFY FINDING RAILROAD'S
SERVANT WAS WITHIN EMPLOYMENT WHEN
INJURED.

In action against railroad for death of serv-
ant crushed between cars, evidence *held* to
justify finding that at time of accident intestate,
under direction of his foreman, was in search
of his tools, which he had left under a shed on
the evening before, so that it could be reason-
ably inferred that he was acting under his em-
ployment.

2. MASTER AND SERVANT ⟫278(18) — EVI-
DENCE HELD INSUFFICIENT TO SHOW FAILURE
TO GIVE SIGNALS.

In action against railroad for death of serv-
ant crushed between cars, evidence *held* insuffi-
cient to justify finding that employé charged
with duty to warn of movement of cars failed
to give signals, as alleged in one count.

3. MASTER AND SERVANT ⟫278(18) — EVI-
DENCE HELD INSUFFICIENT TO SHOW NEGLI-
GENCE OF LOCOMOTIVE ENGINEER IN FAILING
TO GIVE SIGNALS.

In action for death of railroad's servant
crushed between cars, evidence *held* insufficient
to justify finding that engineer of locomotive
was guilty of any negligence through failure to
give warning, showing that he rang bell con-
stantly.

4. MASTER AND SERVANT ⟫265(10)—BURDEN
TO SHOW NEGLIGENCE ON PLAINTIFF SUING
FOR DEATH OF SERVANT.

In action for death of railroad's servant,
burden of proof as to negligence of engineer
of locomotive which caused movement of cars
which crushed plaintiff's intestate was on plain-
tiff.

5. MASTER AND SERVANT ⟫163(1)—RAILROAD
NOT UNDER OBLIGATION TO PLACE WATCH-
MAN FOR PROTECTION OF SERVANT BETWEEN
CARS.

Where railroad built its cars on a track, and
did not pull them out until completed, so that
such pulling occurred only periodically, it was
under no obligation toward a servant working
some 400 or 500 feet from the cars, but at-
tempting to go between them, to place a watch-
man to give warning of their movement at an
opening between the two cars which crushed
the servant.

6. MASTER AND SERVANT ⟫236(16) — RAIL-
ROAD'S SERVANT NEGLIGENT IN GOING BE-
TWEEN CARS OBVIOUSLY ABOUT TO BE MOVED.

A railroad's servant, who walked along
string of cars, which had just been built, while
engine, which was coupling them preparatory
to pulling them out, was ringing its bell, and
cars themselves were obviously in motion, and
knuckles of two between which he attempted
to pass were obviously open and ready for cou-
pling, was guilty of negligence contributory to
his death when caught between such cars.

Appeal from Circuit Court, Morgan Coun-
ty; Robert C. Brickell, Judge.

Suit by Maggie J. Naugher, administratrix,
against the Louisville & Nashville Railroad
Company. From judgment for plaintiff,
defendant appeals. Reversed, and cause
remanded.

Suit by appellee against appellant to re-
cover damages for the death of one Joseph
Naugher, resulting in a judgment for the
plaintiff, from which judgment this appeal
is prosecuted.

The cause was tried upon issue joined
upon nine counts of the complaint and the
plea of contributory negligence. Count 1
rested for recovery upon the negligence of
the engineer in charge, in that he negligently
operated and propelled the cars against plain-
tiff's intestate, and purports to state a cause
of action under subdivision 5 of section 3910
of the Code of 1907. Count 2 rested for re-
covery upon the negligence of one Moore,
who had superintendence intrusted to him,
in his failure to have stationed at or near
the opening between the cars a watchman to
give a signal, and purports to state a cause
of action under subdivision 2 of section 3910
of the Code. Count 3 alleges the negligence
of one McDermott, the engineer in charge of
the engine, in that he failed to give a signal
of the movement of the cars. Count 4 rests
upon the negligence of some person unknown
to the plaintiff, charged with the duty of
giving a signal of the backward movement
of said engine; and count 5 is similar to
count 4, except that it relies for recovery
upon the negligence of one Ralston, who was
charged with the duty of giving such signals.
The averments of count 6 are similar to those
of count 2, with the exception that one Tur-
ley is named as the superintendent who
failed to have a watchman to give a signal
at the opening between the cars. Count 7
purports to state a cause of action under the
common-law count, in that the defendant
failed to furnish a safe place for the intes-
tate to work, the failure in that respect being
that the defendant failed to maintain a
watchman near the place where intestate
was killed. Count 8 alleges that employés
of the defendant were accustomed to cross,
in large numbers, in the discharge of their
duties, the place at the opening between the
cars where the intestate was killed, and that
his death was occasioned by the negligence of
some one unknown, in the service of the de-
fendant, whose duty it was to give the signal
for the engine to make the movement propel-
ling the cars together for the purpose of being
coupled; and, although the signal man knew
that some employé would likely be in a place
of great danger, between the cars, he negli-
gently signaled for such movement of the
engine and cars to be made, without having

---

⟫For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

taken reasonable means of warning intestate of the danger. The ninth count contains practically the same averments as count 2, and alleges that it was defendant's duty to have established rules providing for warnings or signals to be given at said place, and the defendant negligently failed to establish or promulgate such rules. There were demurrers to each of the counts, which were overruled. The affirmative charge was also asked as to each of the counts; said charges being refused.

The following is so much of the statement of facts made by counsel for appellant in brief as is ordered by the court to be set out:

"The Louisville & Nashville Railroad Company in 1917 maintained shops at Albany, Ala. The deceased, Joseph Naugher, had, at the time of his injury, which occurred on February 6, 1917, been working for the defendant as a car repairer, something over a year. There was a particular department maintained by the defendant, known as the car repairing shop, where cars were built and repaired. A portion of this department was under shed, and a portion in the open. That portion in the shed was where the cars were built. This shed was a rectangular building, and inclosed on the north by a wall and partly on the east and west, the wall on the east and west running north and south, a distance of some four or five car lengths. There were six sets of tracks through the shed, numbered, from east to west, 1 to 6 consecutively, the east track being the one nearest the east wall. These tracks extended through the north wall, and engines and cars were brought under the shed, at least on this particular occasion, through the opening in the north wall. The opening in the north wall for track No. 1 was of sufficient size for an engine or car to pass through, leaving a space of some 12 to 18 inches on either side of the car in the entrance. The east wall is a distance of some 6 to 8 feet from the east track, or track No. 1. The car repairing and building department was somewhat removed from the other departments. Cars were built on track No. 1, and when completed were moved off the track by an engine coming in from the north end, and pushing the cars through the south end of the shed.

"On the morning of intestate's injury, there were some 10 or 11 new cars on track No. 1, which had been completed, and, having been completed, the operation by which intestate was injured was a movement of these cars, displacing them from track No. 1 so as to make room for the placing of frames and material for the construction of other cars upon this track. This was a customary movement, and was known to the employés, as it had been customary and usual for some time to remove the cars from this and other tracks when completed. The cars on track No. 1 had been completed the evening before intestate's injury, and intestate had been removed by his foreman from work on this string of cars, and assigned to duties down in the southeast part of the yard, some 400 to 500 feet south of the place where he was injured; the place intestate was assigned to work being east and south of the place of his injury, and some 300 or 400 feet away. It was customary to move these finished cars early in the morning, and this movement was taking place on the occasion of intestate's injury, between 7 and 8 o'clock on the morning of February 6, 1917. There was a space between the cars on track No. 1 between 12 and 18 inches. In other words, while in course of construction a small space was left between the bumpers of each car and along beside this east track, and on each side of it there was a scaffolding suspended from the ceiling, the bottom of the scaffolding being some 6 or 7 feet above the floor of the building, and its arrangement was such that the employés could work on the scaffolding in painting the cars and also doing work on the top of the cars.

"On the morning of February 6, 1917, an engine with its crew of some four or five men came to the building for the purpose of removing these new cars. This engine was on the east track or track No. 1, and was headed south, the engineer being at his place of duty on the right or west side, and the movement of the engine and the crew was to couple up these new cars and shove them on out into the open yard. The engine had two old cars in front of it, and before the movement of coupling the cars commenced the switching crew, composed of T. F. Turley, Ed. Turner, and George Redding, stationed themselves along the string of new cars at intervals, and south of the engine, the engine being in charge of Mr. McDermott. After the crew was lined up along the west side of the string of cars at varying intervals, Mr. Ralston, who was in charge of the movement, went down the string of new cars, opening the knuckles of the bumpers so that a coupling would be made with the contact, and as he opened the knuckles between each car he gave a signal by hallooing, 'Lookout on these cars; we are going to move them.' Ralston started at the north end of the string of cars, and, going in the opening between each car, opened the knuckle and gave this signal until he arrived at the south end of the string of cars. He was engaged from three to five minutes in performing these duties. When he arrived at the south end of the cars, he gave a signal to Turley, who was next to him, and Turley in turn signaled Turner, and Turner in turn signaled Redding, who in turn signaled McDermott, the engineer, to start moving the cars. At this time, the engine was some 50 or 60 feet on the outside of the north end of the shed, and Redding was standing just about the opening of the shed at the north end. McDermott from his position could not see Ralston, Turley, or Turner, on account of being out in the open, and light, and having to look into the shed, which was somewhat darker, and also because the box cars, being in the opening in the north end of the building, obstructed his vision, there being only from 12 to 18 inches space between the side of the box cars and the side of the opening. Before the movement started, the bell on the engine was started to ringing, and continued to ring automatically, and the ringing of the bell was plainly and clearly audible to members of the switching crew stationed along the side of the string of cars, as each one of them testified positively that they heard it; also the witnesses for the plaintiff testified that the bell was ringing. McDermott caused the engine to move in response to signals which were given him, the

signals originating with Ralston, and moved his engine just as he was signaled to do, starting and stopping it just as the signals indicated. The movement of the engine was very slow, between one and two miles an hour, and necessarily the string moved no faster. As the respective couplings were made of the cars in this string, they were attended by the bumping noise, and also-a motion which was visible along the line, and just while this motion was in progress intestate came under the shed from the east side, and, after walking some 12 feet along beside the fifth car and. on the east side, stepped in between the fifth and sixth cars, these cars being about 12 to 18 inches apart, and attempted to cross the track between these two cars, and through this space of 12 to 18 inches, and just as his body was between the coupling of the fifth and sixth cars the movement of coupling the cars caused the contact between the fifth and sixth cars, and caught his body between these couplings and crushed him so that he died."

Immediately after intestate's injury, or just at the moment of his injury, the cars were stopped, and he was removed from between the couplings.

The evidence tends to show that just before going between the couplings of cars 5 and 6, intestate had been walking along the side of the fifth car, and then started directly in between cars 5 and 6, and was caught between the couplings. The evidence further tends to show that Ralston had just previously set the knuckles to these cars, that is, opened the couplings so that by contact the couplings would be closed as they came in contact with each other. A railroad man can tell when the knuckles are set; and, as stated by one witness—

"After a man got up to where he could see the knuckles between the cars, it was visible to a man from either side that the knuckles were open. He would not necessarily have to go in between the cars. He would not have to get up right at them. He could tell that as far as he has good eyes."

It is further shown that, in order for the intestate to go for water or to the toilet from where he was engaged in work on the morning of his injury, he would not have had to cross track 1, as both of these places were on the east side of said track. There was also evidence tending to show that said intestate did not have sufficient tools with him at the place in the yards where he was working, and that only a few minutes previous to his injury, he had been told by his foreman to go for his tools which he had left under the shed the evening before, and that immediately after this instruction by the foreman he had left his place of work and gone toward the shed.

Eyster & Eyster, of Albany, for appellant. The personal representative is the only one who can sue and recover in case of death under the Employers' Liability Act. Section 3912, Code 1907; 178 Ala. 538, 59 South. 568; 185 Ala. 648, 64 South. 557. The suit was not in her representative capacity, but individually. 178 Ala. 636, 59 South. 461; 137 Ala. 491, 34 South. 562; 60 Ala. 449. The demurrer to count should have been sustained. 150 Ala. 419, 43 South. 726, 10 L. R. A. (N. S.) 653, 153 Ala. 223, 44 South. 969; 142 Ala. 602, 39 South. 174; 139 Ala. 425, 36 South. 181. Counsel discussed other assignments of error, but without citations of authority.

Wert & Hutson and E. W. Godboy, all of Decatur, for appellee. Counsel filed no brief on original submission, but filed a brief on rehearing. The rehearing having been stricken, no excerpts are given.

GARDNER, J. The correctness of the statement of facts set out in the brief of counsel for appellant is not questioned by opposing counsel on this appeal, and so much thereof as is here pertinent will be set out in the report of the case, and will be considered as accurate and sufficient, as provided by rule 10 (175 Ala. xviii, 61 South. vii). We may add, however, that a study of the record convinces us of the accuracy of such statement in all material particulars.

· There are numerous questions presented as to the sufficiency of the several counts of the complaint, but we deem it unnecessary to here consider them, as we conclude the case must be reversed upon the questions which raise the substantial merits of the cause.

[1] As preliminary to all other questions upon the merits of the cause, appellant's counsel insist that there is no evidence from which reasonable inference can be drawn that plaintiff's intestate was, at the time of his injury, acting within the line and scope of his authority. While the evidence upon this question is very meager, yet, upon careful consideration of the same, we are persuaded that it suffices for the jury to draw a reasonable inference that, at the time of the fatal accident, intestate was in search of his tools under direction of his foreman, which he had left under the shed on the evening before. We think, therefore, that it could be reasonably inferred that said intestate was acting within the line and scope of his employment. L. & N. R. R. Co. v. Chamblee, 171 Ala. 188, 54 South. 681, Ann. Cas. 1913A, 977.

[2] Count 5 rests for recovery upon the negligence of one Ralston, in that he failed to discharge his duty in giving signals of the movement of the engine. The affirmative charge was due the defendant on this count. Evidence for the plaintiff shows that Ralston gave his usual signal on this occasion. To quote the testimony of one of the witnesses for the plaintiff:

"Mr. Ralston had been down there and given warning between each car; that is, he sounded a warning between the third and fourth cars,

and the fifth and sixth cars. In addition to that, he set the knuckles of those cars for coupling. * * * He goes and halloos between the cars."

The testimony of other witnesses showed that when he gave the warning he said, "Lookout; we are fixing to pull track No. 1." We are unable to find from this record wherein there is any testimony from which it could be inferred that Ralston failed to give the warning as alleged in said count.

[3] We are of the opinion that a like result is to be reached from a consideration of those counts charging negligence on the part of the engineer, McDermott. The cars were being coupled one at a time, and the engine was moving at the slow pace of one or two miles an hour. The undisputed evidence shows that the engineer could not see plaintiff's intestate, as he was on the opposite side of the track and the cars obstructed his view. He had to slowly move his engine in response to the signals given him, and as each car was coupled the engine came to a stop; as the engine moved the bell was rung. The evidence is silent as to whether or not there was any blast of the whistle, or as to whether or not, under the circumstances here disclosed, the whistle should have been blown.

[4] We are not favored with a brief by counsel for appellee, but from a careful study of the record we cannot conceive where any negligence has been shown on the part of the engineer in charge of this engine, unless it be considered that the whistle should have been blown. The burden of proof was upon the plaintiff, and we are pursuaded that this burden has not been sufficiently met, and that the affirmative charge should have been given upon these counts.

Count 7 we construe as relying for recovery upon the failure of the master, in discharge of his common-law duty, to furnish the plaintiff's intestate a safe place in which to work. The failure of this common-law duty rests upon the averment that the defendant did not have a watchman stationed at this particular opening between these cars. It is shown from the record that these cars are first placed upon this track in the form of frames only, and remain there until their completion, when they are "pulled out." This was being done when plaintiff's intestate received his fatal injury. The danger here complained of occurred only periodically, and the negligence complained of related to the manner of doing the work. In Langhorne v. Simington, 188 Ala. 337, 66 South. 85, it is said:

"It is generally considered that the rule requiring an employer to provide his employé with a safe place does not operate 'where the prosecution of the work itself makes the place and creates its dangers.'"

[5] We are of the opinion that, under the influence of this authority, the affirmative charge should also have been given at the defendant's request as to this count.

[6] But, aside from the foregoing considerations, we are persuaded that the defendant was entitled to the affirmative charge on the ground of the contributory negligence of plaintiff's intestate. It is to be observed that said intestate's place of work was some 400 or 500 feet from the place of his injury; that he was merely crossing the track, going to some place under the shed in search of his tools. He was therefore not working upon this track, and does not come within the influence of what was said in L. & N. R. R. Co. v. Williams, 74 South. 382,[1] wherein Mr. Thompson's work on Negligence, § 1839, is quoted approvingly. In Labatt on Master and Servant, § 332, it is said:

"A servant is not in the exercise of ordinary care, unless, at each stage in the progress of his work, he makes an effective use of his bodily and mental faculties, and observes as attentively as is reasonably possible under the circumstances the condition of the instrumentalities by which his safety may be affected, and the result of their operation by himself or others, in so far as that operation may tend to subject him to danger."

In subdivision (b) of the same section is:

"It has been expressly held that the rule of law which excuses passengers from the obligation to observe a strict lookout for trains and locomotives when alighting from or getting upon trains over the tracks of a railway company does not apply to employés whose duties may require them to cross the tracks in the yards or at the station houses. The obligations of an employé under these circumstances have sometimes been considered to be virtually the same as those incumbent upon travelers who are about to use a highway crossing, viz., to look and listen before going on the track."

To like effect see Dyerson v. Union Pac. Ry. Co., 74 Kan. 528, 87 Pac. 680, 7 L. R. A. (N. S.) 132, 11 Ann. Cas. 207. The following are some of the cases supporting this view: L. & N. R. R. Co. v. Williams, 172 Ala. 560, 55 South. 218; Andrews v. Birmingham Min. Ry. Co., 99 Ala. 438, 12 South. 432; L. & N. R. R. Co. v. Hall, 87 Ala. 708, 6 South. 277, 4 L. R. A. 710, 13 Am. St. Rep. 84. In this latter case, speaking of the duty of the employé in the exercise of precaution, the court said:

"And taking into the account the surroundings and perils attendant upon the nature of the service he enters upon, he must bestow such care, watchfulness, and caution as ordinarily prudent men would usually exercise in reference to their own safety, under like circumstances. * * * He is guilty of contributory negligence if, in his care, diligence, and watchfulness, he falls below the standard stated above."

---

[1] 199 Ala. 453.

Intestate was killed while attempting to walk between the fifth and sixth cars, which were at the time being coupled preparatory to their removal from the shed. He had, just the evening before, quit work on these cars as they were completed. He had been at work in that place for the period of a year, and clearly must have known that the cars were to be removed soon after their completion—as was the custom—to make room for others. It is without dispute that as the engine moved the bell rang, and the cars were being coupled at the same time. Mr. Stewart, witness for the plaintiff, testified that he saw intestate's feet while he was walking along by the fifth car for a distance of 10 or 12 feet; that the engine was putting this cut of cars in motion, engaged in coupling them one to another; to use the language of the witness:

"Before Mr. Naugher turned to go in between the fifth and sixth cars, I would say it had been about a minute since this engine and car had coupled to the third car; then the third car coupled to the fourth car, and then after that the fourth car coupled to the fifth car, and when it was in the act of coupling to the sixth car, then is when Mr. Naugher was killed. * * * Each of these couplings was attended with a more or less knocking noise. * * * I did not see him hesitate; he walked right straight, without stopping, or anything, in between the fifth and sixth cars; he just turned in between them as quick as he came to them."

In addition to this testimony, the witness stated that Ralston had set the knuckles between the cars ready for coupling, and that this was visible to a man from either side; that is, that any railroad man would know that the knuckles were open, and would not have to go between the cars to ascertain that fact. The evidence is without conflict that, notwithstanding the noise attendant upon the coupling of the cars, the ringing of the bell of the engine, and notwithstanding there was evidently some motion of the cars at the time the intestate was walking along the side of the fifth car, he (intestate), without the slightest hesitation, turned quickly between the fifth and sixth cars, attempting to pass through, and was caught between the couplings as the cars were being coupled together. The testimony of plaintiff's witness, from which the above quotation is taken, also shows that, in addition to this warning, the knuckles were open and plainly visible to intestate, who was a man of normal eyesight and hearing, and which was a warning within itself that the cars were ready to be coupled. Had he looked, he must have seen, or had he listened, he must have heard and known, the danger, and had he hesitated, even for a moment, he would doubtless have been saved.

We have read the record a second time with much care, and with a full appreciation of the responsibility resting upon us, and its careful study forces the conclusion irresistibly upon the mind that the proximate cause of intestate's untimely death was his own thoughtlessness and inattention to the dangers surrounding him. We need not discuss the evidence in detail, nor cite an array of authorities upon the question of contributory negligence, but content ourselves with what is said above as sufficient in disclosing our conclusion that the plaintiff was barred of recovery on account of the contributory negligence on the part of her intestate.

It results that the judgment of the court below will be reversed and the cause remanded.

Reversed and remanded.

ANDERSON, C. J., and SAYRE and BROWN, JJ., concur.