34 So.2d 474

**AMERICAN MUT. LIABILITY INS. CO. v. LOUISVILLE & N. R. CO. et al.**

6 Div. 628.

Supreme Court of Alabama.

March 18, 1948.

London & Yancey and Chas. W. Greer, all of Birmingham, for appellant.

Chas. H. Eyster, of Decatur, and Gibson & Gibson, of Birmingham, for appellee.

356

STAKELY, Justice.

Ingalls Iron Works owned and operated a structural and fabricating plant at Birmingham in June 1942 and employed more than 100 employees among whom was Wilmer L. Warren. The company was under the Alabama Workmen's Compensation Act, Code 1940, Tit. 26, § 253 et seq. The American Mutual Liability Company was its compensation insurance carrier. On June 26, 1942, Warren was killed while on duty at the plant. He left his widow as his sole dependent. The insurance company acknowledged its liability for the payment of compensation and payments were in process at the time this suit was filed and were being made when the case was tried. This suit was brought by The American Mutual Liability Insurance Company for its benefit and the widow's benefit against the L. & N. R. R. Co. and others, as will be shown, for negligently and wrongfully causing the death of Wilmer L. Warren. The L. & N. R. R. Co. was charged with being a common carrier engaged in interstate commerce at the time of the accident. Trial resulted in a verdict and judgment for the plaintiff against the L. & N. R. R. Co. On motion of the defendant, the L. & N. R. R. Co., the court set aside the judgment. From the ruling on that motion this appeal has been prosecuted.

The L. & N. R. R. Co. is a common carrier of both intra and interstate freight and passengers. It had in its service a switching crew, complete with five men, McQuaid, foreman; Glover, engineer; Biddings, fireman; Beavers, switchman and Smith, switchman. All of these individuals were originally made parties to the cause along with the L. & N. R. R. Co. By amendment all parties were stricken as defendants except the L. & N. R. R. Co. and Smith.

The plant of Ingalls Iron Works is located just west of the right of way of the L. & N. R. R. Co. and is enclosed in a wire fence. A spur track leads from the main line of the railroad company and passes through a gate at the plant's east boundary. After entering the plant this track branches off into four spur tracks, each running generally east and west through the plant. The track lying furthest north is called Track No. 1. Cars of freight consigned to the Ingalls Company are placed on Track No. 1 where delivery and acceptance from the carrier becomes complete. South of that is Track No. 2. Switching operations are made over this track to the Navy Yard and other operations on the west. About 10 or 12 feet south of Track No. 2 is Track No. 3. Switching operations are made over Track No. 3 to serve the warehouse and steel stock pile and cars are placed on Track No. 3 for both loading and unloading. About 100 feet south of Track No. 3 lies Track No. 4. This track serves that part of the plant to the south and is used for switching operations.

These four tracks run east and west and are crossed by an overhead crane which operates on two overhead tracks. These crane tracks run north and south and are known as east and west crane tracks. They are 80 feet apart and extend both north and south of railroad Tracks 2 and 3. The crane tracks are supported by upright steel supports resting in concrete abutments. Steel is stacked and stored underneath the crane tracks, the steel strips being about 65 feet long. At the time of the accident here involved, steel was stacked parallel to Track No. 3 on the south 6 to 7 feet from the track and about 7 to 15 feet in height.

There is an open space about 6 feet wide running from north to south underneath the crane which is called "Hooker's Path." This path is left open, steel being stacked on both its east and west sides. The purpose of the path is to afford a way for the man known as the hooker to follow the crane and hook the lines carried by the overhead crane for the steel below in either loading or unloading the cars and making delivery where needed. When cars are placed on Tracks 2 and 3 under the crane for loading or unloading, they are usually separated 8 to 10 feet so that the hooker can pass from one side of the railroad tracks to the other in following the crane. This path was also used by expediters and other workmen having business at the plant. If it was necessary to place a car so as to block this path, a passageway was left open across the track usually as near the regular path as possible. An expediter is an employee whose duty it is to see that

shortage in material at one point in the plant is remedied by delivery of the needed material from another part of the plant where it is stacked or stored. His duties carry him all over the plant. Wilmer Warren had been employed as an expediter for about a year prior to the injury and was familiar with his duties.

About 36 feet east of the east overhead crane track is a roadway about 25 feet wide running north and south which is used for both vehicular and pedestrian travel by employees of the Ingalls Company.

Car PLE loaded with steal and about 42 to 45 feet long and 7 to 8 feet high above the railroad rails was located on Track 3 under the steel crane. The east end of this car was almost under the east crane track while the west end of this car was a few feet west of the west margin of the Hooker's Path. This caused the car to block the Hooker's Path across the railroad tracks. Car PLE was loaded and not in position for unloading. Tendencies of the evidence showed a car on Track 3 west of car PLE.

At 7 o'clock on the morning of June 26, 1942, the cars on Track No. 1 which had been delivered to the Ingalls Plant during the night were checked and recorded. Among these cars were two cars loaded jointly with steel from Tennessee Coal & Iron Co. These two cars were designated as L & N 25715 and PA 38489.

At 9:15 on the morning of June 26, 1942, the L. & N. engine crew, referred to above, went to the Ingalls Plant "light", that is without cars attached. The yard plant foreman of Ingalls then took charge and directed the crew foreman as to what cars Ingalls wanted moved and where to place such cars. In other words Moseley, the Ingalls yard foreman, directed McQuaid, the L. & N. crew foreman, as to the movement of the cars and only such cars were moved as were so directed.

The first movement was for the engine to go in on Track No. 1 where seven cars had been placed, including L&N 25715 and PA 38489. The engine pulled these seven cars back up to the switch at the gate and then placed an empty car on Track No. 4. Cars L&N and PA were then placed on Track No. 3. The remaining cars were then put back on Track No. 4. When Cars L&N and PA were put on Track 3 they were stopped a short dictance from Car PLE and chocked from the north with chocks under the east side of the wheels as this track was upgrade from east to west. The opening left between Car PLE and the western end of the two cars loaded jointly will be described later. Cars L&N and PA were to be placed in the Navy Yard but before Cars L&N and PA could be properly placed in the Navy Yard the empty cars there had to be pulled out. Accordingly it was necessary to place Cars L&N and PA on Track 3 until the engine could go down in the Navy Yard and pull out three empty cars and then couple L&N and PA on the west end of these empty cars to be shoved back into the Navy Yard.

The injury to Wilmer Warren occurred about 20 to 30 minutes after L&N and PA cars had been put on Track No. 3.

The engine pulling the three empty cars out of the Navy Yard backed up on the main line and switched from Track No. 2 to Track No. 3 pushing three empty cars ahead of it on Track No. 3 for the purpose of coupling with PA and L&N cars so as to pull them back up to the main line, and there to switch back over to Track No. 2 for delivery to the Navy Yard.

Track No. 3 was straight for a distance of 100 to 120 feet east of east end of Car PA at which point the track began to curve in a northerly direction. The engine and three empty cars traveled west over Track No. 3 to couple with Car PA at a rate of speed of two miles per hour. The engine was still back on the curve at the time Wilmer Warren was injured. It was giving off smoke and the bell was ringing continuously.

When the engine pulled these three empty cars out of Track No. 2, Charlie Smith, the switchman, dropped off at the road crossing about 8 to 10 feet from the east end of Car PA and walked over to Car PA and adjusted the knuckles so that there would be a coupling made when the three empty cars were brought in on Track No. 3 and Charlie Smith remained at the east end of Cars PA and L&N on the north corner until the coupling was made. This was the place for him to be so that he

could signal the engineer who was on the right or north side of the engine. Beavers was located down close to the gate at the switch where he had to be to throw the switch so that the engine and empty cars could get from Track No. 2 onto Track No. 3. The engineer and fireman were at their respective places on the engine. Mc-Quaid was standing down about the engine with Moseley. Thus all five members of the train crew were accounted for. While the engine pushing these three empty cars traveling at a rate of speed of two miles an hour, emitting smoke, and the bell ringing, proceeded westwardly on Track No. 3 to couple with Cars PA and L&N, Wilmer Warren, supposedly coming from the Template Shop got over into the Hooker's Path where he was first seen, and proceeded northwardly up this Hooker's Path to where Car PLE was blocking the Hooker's Path. He then turned to his right and walked east along the south side of Car PLE a distance of approximately 30 to 40 feet. While Warren was walking this distance of about 30 to 40 feet, the three empty cars pushed by the engine were traveling westerly towards Warren for a distance of 100 to 120 feet over a straight track. During the entire time that Warren was walking from the Hooker's Path to the opening between the Cars PLE and L&N and PA, the empty cars were moving toward him on straight Track No. 3. When Warren got to this opening between Car PLE and L&N and PA cars he walked into the opening and in the next second or two fell backward injured, the empty cars having coupled into Car PA just at the moment Warren started to go between Car PLE and L&N and PA cars.

George Walker was about 30 feet behind Wilmer Warren as he came up the Hooker's Path and saw him walk between the cars and in about two or three seconds fall back injured. His testimony does not show whether Wilmer Warren stopped, looked and listened before entering the opening between the cars. He is the only person who saw Wilmer Warren move up the Hooker's Path, turn toward the right and walk beside Track 3 and enter the opening. There is no proof as to how close Wilmer Warren walked beside the cars standing on Track 3. George Walker, according to his own testimony, did not hear the bell ringing, did not see the smoke from the engine and did not see any movement of the approaching cars until the coupling.

When Wilmer Warren walking north on the Hooker's Path reached Track 3, there was a space 6 to 7 feet between the cars on Track No. 3 and the steel stacked along the south side of this track. There the view to the east down the open space beside the Track 3 was unobstructed to the curve in the track where the engine was located. The track is straight for a distance of 175 to 200 feet east from where Wilmer Warren was hurt and the curve.

It had long been the practice and custom of L. & N. R. R. Co. to come to the Ingalls Plant each morning around 9 o'clock and make intra plant switching operations there as directed by the yard foreman of Ingalls, which extended over a period of an hour or so. During this time the several tracks in the Ingalls Plant were being constantly used in such switching operations all of which was generally known to the employees of Ingalls.

Smith, the switchman, as soon as the coupling was made started west toward Car PLE to make the coupling there. There was no switchman or flagman at this opening between the cars when Wilmer Warren was injured. As Smith got about to this car he heard Wilmer Warren groan and discovered him. He immediately called Mc-Quaid and Moseley.

According to Smith he gave the engineer the come forward signal. He signaled the engineer to stop when the end of the moving car was about 18 to 20 inches away. According to him the coupling was light and the stationary cars were not moved over 10 or 12 inches.

We come now to a description of the opening between Car PLE and Car L&N into which Wilmer Warren walked when he received his injuries. In considering the evidence in this regard, it should be kept in mind that the opening where Wilmer Warren was injured was practically at the east crane track. The Hooker's Path was about 35 to 40 feet west of the opening where Wilmer Warren was injured and

was blocked by Car PLE. The roadway for pedestrian and vehicular travel was about 25 to 30 feet east of the opening where Wilmer Warren was injured and was blocked by Cars L&N and PA. We now set out the evidence with reference to the opening where Wilmer Warren was injured. The witness Roberts, Chief Stock Clerk for the Ingalls Iron Works, testified:

"Q. On this occasion and for a long time prior thereto, state whether or not there had been a space or opening left there for workmen to pass through? A. You are talking about the middle of the crane runway?

"Q. Yes, sir.

· "The Court. There is some confusion. I will ask him myself a question. Are you testifying about an opening between where you found this blood or some other place? A. I am talking about the middle of the crane runway.

"Q. You mean to the west of where the blood was? A. Yes, sir.

"Q. I will ask you this: you say for a long time they left those cuts in the cars there when the cars were coming to be loaded? A. Right in the middle of the crane runway, there is a walkway between the cars for the workers to walk back and forth from one end of the crane runway to the other. They cut those cars to keep them from going under them or going around them. * * *

"Q. 'X' is place of accident and that is practically under the east crane runway. Is that right? A. Yes, sir. * * *

"Q. Now then, with reference to this crane runway, I am talking about the space within the crane runway now, that is, between the runs. You say right down the middle of it there is a walkway or path, is that what you call it? A. It is a walkway * * *.

"Q. That walkway comes back through that crane runway right down the middle of it? A. Yes, sir, extends from one end to the other.

"Q. How wide is it? A. 5 or 6 feet.

"Q. 5 or 6 feet? A. Yes, sir. * * *

"Q. Now at that time there was a roadway which was east of the crane runway, was there not? A. Yes, sir. * * *

"Q. When a space is left open there is some 8 or 10 feet between the cars isn't there? A. That is right. When we are cutting for the crane runway, we don't leave them that distance—dangerous.

"Q. You didn't leave them 15 or 18 inches? A. No sir. * * *

"Q. So then, there was no pathway or roadway across this Track No. 3 at the time this accident happened, except this path that came down the middle of the crane runway and this road over here to the east? A. No, sir. * * *

"Q. And the only place you had ever seen them leave cars open, separated 5 or 6 feet would be opposite this path down through the middle of the runway? A. Yes, sir. That other roadway was left open.

"Q. That was left probably 20 or 25 feet apart? A. That is right—for trucks to get through. * * *."

J. P. Fulton, Safety Inspector for the Ingalls Iron Works, testified:

"Q. When those cars are left with a space between them for these hookers to pass back and forth from the north side to the south side of these tracks, there is a space of 10 or 12 feet between the cars? A. Sometimes and sometimes not so long.

"Q. There is usually a wide space between the cars? A. Yes, sir.

"Q. Anywhere from 8 to 10 or 12 feet? A. Sometimes.

"Q. When they are left that way you know they are left so the hookers can go from the north side of those Tracks 2 and 3? A. That is right.

"Q. Or any other employee? A. Yes, sir. * * *

"Q. Now, you know where that path is, that is right down the middle of the crane roadway? A. Yes, sir.

"Q. That is a path for the hookers to use? * * * A. Yes, sir.

"Q. That path is usually 6 or 7 feet wide, is that right? A. No, sir, it isn't that wide.

"Q. It is not that wide? A. No, sir.

"Q. How wide is it? A. I wouldn't say it was over 4 or 5 feet wide. * * *."

360

Charles Smith, a brakeman for the L. & N. and member of the switching crew, testified:

"Q. Wasn't it customary to leave a space for the crane'men. That is, the one down on the ground and for people in the plant where cars were parked and left there at or near where Mr. Warren was injured when you left the cars there? A. We had never cut no crossing there at all. We had never opened no cars there at all.

"Q. You had never left in that walk anything open between those cars?

The Court: He asked him at or near the roadway?

"Q. There was a space there that morning? A. Yes, sir.

"Q. And there was a space on the east where you made the coupling? A. Yes, sir: crossing there. * * *

"Q. Now, Charley, when your train was on this Track No. 2 and came back here going in an easterly direction, do you remember seeing an opening between these two cars you all had just put in there and a PLE car that was under the crane? A. Yes, sir.

"Q. About how wide was that opening? A. It looked to be about 15 or 16 inches.

"Q. 15 or 16 inches? A. 15 or 16 inches wide.

"Q. It wasn't left there for people to pass through? A. No, sir. * * *."

John Walker, who was employed by Ingalls Iron Works as a hooker's assistant, testified:

"Q. State whether or not according to your knowledge there was a pathway across the railroad tracks at or near the point where Wilmer L. Warren was fatally injured? A. There was.

"Q. If your answer is in the affirmative, describe said pathway? A. It was a flat road with ashes in the little opening between the cars there, where he went between there, a flat road.

"Q. From your knowledge of the premises at Ingalls Iron Works in Birmingham, Alabama, were workmen in the habit of crossing the railroad tracks at or near the point where Wilmer L. Warren received his injuries? A. They were. I had been

through there myself 7 or 8 times on that date—that morning. * * *

"Q. If you say Mr. Warren walked between two cars which were stopped or standing on the tracks in Ingalls Iron Works inclosure, then state how far or about how far these cars were apart. A. They were about 3 feet before they coupled up the first time. * * *

"Q. If you know, state how long said cars had remained in that position. By remaining in that position, I mean how long they had been uncoupled and apart prior to the accident? A. About a day and a night. * * *

"Q. State whether or not on the day of the accident involved in this case, the place where Mr. Warren was injured was a walkway or used as a walkway by employees of the Ingalls Iron Works. A. It was.

"Q. State how long this place had been used as a walkway or part of the walkway for employees of Ingalls Iron Works in crossing the tracks where the fatal accident occurred. A. For a day and a night with those cars and we had been using a walkway like that for 10 or 12 years, we were just at that particular time using that walkway, you see.

"Q. You were asked in interrogatory 26 about a path. Where was the path asked about with reference to the roadway (the roadway runs approximately north and south about 125 feet NE of the Ingalls Iron Works Plant), what distance was said path from said road and what distance? A. That is the path he was hit. Well, that little path was about 3 and ½ feet wide, I imagine down side of the railroad and then it runs on out in the yard until it gets to the flat field where they stack steel with them overhead cranes. * * *"

Beavers, switchman of the L. & N. R. R. Co., and a member of the engine switching crew, testified:

"Q. Now, when you got there how far apart were the couplings in those cars, Mr. Beavers, in your best judgment? A. At the time I got there they were something like 14 or 15 inches.

"Q. Had you seen that opening between those cars when you were coming up on

No. 2? A. Yes, sir, I noticed the opening as I come down on No. 2.

"Q. And about what was the width of that opening when you came by there? A. It was about the same thing.

"Q. About the same thing? A. Yes, sir.

"Q. 14 or 15 inches? A. Yes, sir. * * *."

McQuaid, the switch engine foreman for the L. & N. R. R. Co., testified:

"Q. Had you seen that opening between those cars before this movement was made? Did you know they were about 15 inches apart? A. Yes, sir. * * *"

■ The motion to set aside the verdict and judgment and grant the defendant a new trial which the court granted, was based on a number of grounds, including the ground that the verdict was contrary to the weight of the evidence. The court granted the motion but did not state the ground on which it was granted. However if the court's action in granting the motion was justified on any ground set forth in the motion, the judgment setting aside the verdict and judgment should be affirmed. Harrison v. Birmingham Water Works Co., 9 Ala.App. 605, 64 So. 164. We think that the Court's action is entirely justified on the ground that the verdict and judgment was contrary to the weight of the evidence. Since we have reached this conclusion, the judgment of the court will not be disturbed, because we do not think that the evidence so plainly and palpably sustained the verdict as to justify us in disagreeing with the judgment of the trial court. Cobb v. Malone, 92 Ala. 630, 9 So. 738; Lindsay Products Corp. v. Alabama Securities Corp., 247 Ala. 662, 25 So.2d 852; Hyde v. Norris, post, 518, 35 So.2d 181.

In summary this is the way in which we have reached our conclusion. In going down to the Navy Yard on Track No. 2 after Cars L&N and PA had been on Track No. 3, the engine and crew had to pass along beside these cars and car PLE and within about 10 to 12 feet of them and when the engine coupled to the three empty cars in the Navy Yard and pulled them out of the Navy Yard over Track No. 2, they again had to pass these three cars. All of the crew who were put on the witness stand said that Car PLE was separated from Car L&N about 15 to 16 inches. Smith, the switchman, expressly testified that they had cut no crossing at all where Wilmer Warren was injured and the opening was only about 15 to 16 inches. Other witnesses support this view.

■ The appellant relies on the testimony of John Walker. A careful consideration of the questions propounded to him and his answers thereto indicate some confusion on his part and that he might have had reference to the regular roadway which had been blocked by Cars L&N and PA, rather than the small opening into which Wilmer Warren entered. But be that as it may, he expressly testified that the opening had been there for a day and a night prior to the accident and that he had been through there seven or eight times. It is without dispute that Cars L&N and PA had been placed on Track No. 3 adjacent to Car PLE only 20 to 30 minutes prior to the accident. The evidence is further to the effect that the engine with the empty cars was advancing at a rate of two miles an hour and that the coupling was light, the cars moving only a few inches, which would not be enough to close a gap of considerably increased width. It does not seem reasonable that the opening between Car PLE and Car L&N, where Wilmer Warren was injured, was for the purpose of affording a Hooker's Path. The accident happened practically under the east crane runway. This runway was supported by concrete abutments which would preclude a Hooker's Path at this point. We believe that the great weight of the evidence clearly shows a narrow opening of 15 to 16 inches and not an opening of 3 to 4 feet wide, designed for use by employees of the plant.

Having reached this point, there was no invitation express or implied to Wilmer Warren to cross through the narrow opening and there was accordingly no need for a flagman or switchman at the opening to warn that the cars would be coupled there. Authorities such as Louisville & N. R. R. Co. v. Williams, 183 Ala. 138, 62

So. 679, Ann.Cas.1915 D, 483, which deal with the absence of a flagman or cases such as Birmingham Southern R. Co. v. Harrison, 203 Ala. 284, 82 So. 534, which deal with the failure of a mechanical device to warn pedestrians, have no application in this case.

■ This reduces the case to the following situation. The duties of Wilmer Warren carried him all over the plant of Ingalls Iron Works, over all of its crossings and pathways. With these things he was thoroughly familiar as well as with the fact that he was crossing the track at the time he was injured at the very time when it was usual for switching operations to be in progress. He proceeded northwardly along the Hooker's Path and turned to his right down a corridor along which he had an unobstructed view to the curve in the track about 200 feet away. On Track 3, which was straight towards him from the curve, three empty cars were approaching although the engine was still on the curve. For 35 to 40 feet he walked facing in the direction from these empty cars were approaching. The bell of the engine was ringing. The engine was emitting smoke. Conceding that he may not have heard the bell on account of the noise in the plant and that the smoke may have been blown in some other direction, it remains a matter of common sense that he did not stop, look, and listen, because if he had he could not have failed to see the approaching cars. Under the circumstances we are forced to the conclusion that the proximate cause of Wilmer Warren's untimely death was his own inattention to the danger in going between the cars on the railroad track. Louisville & N. R. R. Co. v. Naugher, 203 Ala. 557, 84 So. 262; Southern Ry. Co. v. Miller, 226 Ala. 366, 147 So. 149; Louisville & N. R. R. Co. v. Richards, 100 Ala. 365, 13 So. 944; Louisville & N. R. R. Co. v. Simmons, Ala.Sup., 36 So.2d 459.

The L. & N. R. R. Co. takes the position that the provisions of the Alabama Workmen's Compensation Act, as set forth in § 311, Title 26, Code of 1940, are applicable and preclude recovery except as authorized by this section. This position is based on the contention that Wilmer Warren was an employee of the Ingalls Iron Works and was in no sense engaged in interstate commerce and further that at the time of the injury the L. & N. crew only made such moves as were directed by the yard foreman of Ingalls Iron Works. It is claimed that such movements were purely intra-plant movements and had nothing to do with interstate commerce.

Section 263, Title 26, Code of 1940, provides that the Workmen's Compensation Act of Alabama "shall not be construed or held to apply to any common carrier doing an interstate business, while engaged in interstate commerce, * * *."

■ Appellant contends that the L. & N. R. R. Co. was engaged in interstate commerce at the time of the accident and accordingly that § 311, Title 26, Code of 1940, has no application. On the contrary appellant claims its right of subrogation and brings this suit under § 312, Title 26, Code of 1940, to recover damages for acts of the defendant in wrongfully and negligently causing the death of Wilmer Warren, including the aggregate amount of compensation payable and which it is obligated to pay as compensation carrier under the Workmen's Compensation Act of Alabama, together with costs of the action and such further sum as the evidence may reveal it is entitled to receive for prosecuting the action, including reasonable attorney's fees of $1,000. It is alleged in substance in the complaint that the plaintiff, as directed by the provisions of the Workmen's Compensation Act of Alabama, namely § 312, Title 26, Code of 1940, will pay over to the widow of decedent, who is his sole dependent, any sum received by it as damages, in excess of the amount paid by it as compensation, costs, reasonable expenses and attorney's fees. In result it is claimed that under § 312, Title 26, Code of 1940, the compensation carrier in this case may recover for the benefit of the widow such punitive damages as could be recovered under the Homicide Act. Code 1940, Tit. 7, § 123. This interpretation of § 312, Title 26, Code of 1940, is correct. Robinson v. Western Ry. of Alabama, 243 Ala. 278, 9 So.2d 885; Georgia Casualty Co. v. Haygood, 210 Ala. 56, 97 So. 87.

The uncontradicted testimony in this case is that the L. & N. R. R. Co. was an interstate carrier, that the crew involved in this accident were used constantly in and about the handling of interstate cars on the main lines of the L. & N. R. R. Co. as well as for other corporations in the vicinity of Ingalls Iron Works, that Ingalls Iron Works was fabricating and shipping to Mississippi large numbers of cars of steel to be used in the construction of ships. It was agreed between the parties that a substantial part of the operations of the switching crew involved was on the date of the accident and for a long time prior thereto devoted to the interstate movement of cars.

The Federal Employers' Liability Act provides that every common carrier by railroad while engaged in commerce between any of the several states, etc. shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce. The 1939 amendment to that act provides: "Any employee of a carrier, any part of whose duties as such employee shall be the furtherance of interstate or foreign commerce; or shall, in any way directly or closely and substantially, affect such commerce as above set forth shall for the purposes of this chapter, be considered as being employed by such carrier in such commerce." U.S.C.A., Tit. 45, § 51.

 It seems clear to us that the L. & N R. R. Co. was a common carrier and was engaged in interstate commerce within the meaning of the foregoing federal statute as amended at the time Wilmer Warren was killed. The L. & N. R. R. Co. could only act through its agents and if the duties of the crew here involved were in furtherance of or in any way directly or closely or substantially affecting such commerce, the employer was engaged in interstate commerce. Since the crew was engaged in interstate commerce on that occasion within the meaning of the act, as amended, the L. & N. R. R. Co. was necessarily engaged in such commerce and was not, therefore, subject to the Alabama Workmen's Compensation Law. Edwards v. Baltimore & O. R. Co., 7 Cir., 131 F.2d 366; Prader v. Pennsylvania

R. Co., 1943, 113 Ind.App. 518, 49 N.E.2d 387; Rainwater v. Chicago, R. I. & P. Ry. Co., 207 La. 681, 21 So.2d 872. Appellant has the right to proceed under the provisions of § 312, Tit. 26, Code of 1940. By its own terms the act of the legislature, approved Oct. 9, 1947, Gen.Acts 1947, p. 484, repealing § 311 and amending § 312, Tit. 26, Code of 1940, has no application in this case.

The result of our affirmance of the action of the trial court in setting aside the verdict and judgment is to put the case back on the trial docket.

Affirmed.

GARDNER, C. J., and FOSTER and LAWSON, JJ., concur.