37 So.2d 584
## BIRMINGHAM ELECTRIC CO. v. TONER.
### 6 Div. 636.

Supreme Court of Alabama.

Oct. 7, 1948.

Rehearing Denied Dec. 2, 1948.

Lange, Simpson, Robinson & Somerville, of Birmingham, for appellant.

H. H. Grooms and Spain, Gillon, Grooms & Young, all of Birmingham, for appellee.

STAKELY, Justice.

This is a suit brought by Mrs. Edna D. Toner, as administratrix of the estate of Frank Toner, deceased, against the Birmingham Electric Company to recover for the death of her intestate alleged to have been caused by the negligence of the servant, agent or employee of the defendant while engaged in the line and scope of his employment. Trial of the case resulted in a verdict and judgment for the defendant. Upon motion of the plaintiff the court set aside the verdict and judgment and granted the plaintiff a new trial. This appeal is from the ruling on that motion.

The motion was based on a number of grounds, including the ground of newly discovered evidence and the ground that the verdict was contrary to the great weight of the evidence. In granting the motion the court did not state the ground on which the motion was granted. The only assignment of error is the ruling of the court on the motion, and in their argument counsel for appellant confine their discussion to the grounds to which we have referred.

Frank Toner died as a result of injuries sustained in a collision between a United States Army truck in which he was riding as a soldier and a streetcar operated by the defendant. The deceased was in an army convoy which had come to Birmingham from Fort McClellan for the Armistice Day parade on November 11, 1941. The convoy contained a considerable number of vehicles and was in several sections. After leaving Legion Field on its way back to camp the convoy proceeded eastward along Eighth Avenue, North, to Fourteenth Street and turned south on Fourteenth Street toward Fourth Avenue. The collision between the truck in which deceased was riding and the streetcar occurred in the intersection of Fourteenth Street and Fourth Avenue, at a time when the truck was moving south on Fourteenth Street and the streetcar was moving west on Fourth Avenue. It was after dark when the collision took place. The street lights were on. There were stop signs protecting the traffic going both east and west on Fourth Avenue but no stop light. There were no military police or police officers of the City of Birmingham anywhere near the intersection at the time of the accident. The driver of the truck in which intestate was riding entered the intersection without stopping up to the point of collision. The deceased was riding in the back of the truck with three other soldiers. A tarpaulin separated them from the driver and the soldier riding beside the driver. The tarpaulin obstructed the view to the rear of the driver and the soldier beside him. It also obstructed the view to the front of the soldiers in the rear of the truck.

Joseph F. Scaduto, the driver of the truck at the time of the accident, Anthony Sperilli and James Carberry, soldiers who were riding in the truck, testified for the plaintiff. Their testimony tended to show that there were about 30 to 40 trucks in their part of the convoy, the truck in which they were riding being in about the center thereof, that the convoy was moving at about 25 to 30 miles per hour and did not stop at any intersection in the dozen blocks or so that it had travelled from Legion

Field, that the trucks were in line, all had their lights on and were spaced about 40 to 50 feet apart, that there was no break in the line of the convoy at any time before the accident, that this particular truck had not stopped or gotten out of its place in the line, and that its speed was steady, that they saw the streetcar just before it entered the intersection going about 35 to 40 miles per hour, that they did not notice any traffic on the streets at the intersection. Joseph F. Scaduto denied that he had told a police officer before leaving the scene of the accident that there was a break in the line of the convoy ahead of him.

Carl Neill, a city police officer, testified that Joseph F. Scaduto did state to him at the scene of the accident that there was a gap in the convoy ahead of the truck he was driving, that Scaduto pointed to an alley about half a block away as indicating the distance of the truck ahead of him, that he did not put his conversation with Scaduto on his report of the accident nor did he put on the report any conversation with witnesses.

Virginia Neuman and Doris Hollingsworth testified that they were in a car riding along beside the convoy in the same direction, that they were talking to some of the soldiers in the convoy, that there was no police officer or military police present at the time of the accident, that they saw no army trucks just ahead of this particular truck.

J. M. McCullouch, the operator of the streetcar, testified that all four corners of the intersection were blind corners on account of buildings or fences, that when he reached the east edge of Fourteenth Street he was travelling four to six miles an hour, that when he reached the intersection there was one car on Fourteenth Street on the north side headed south and one standing on the west side of Fourteenth Street, that there was no traffic standing in Fourth Avenue waiting to enter Fourteenth Street the way he was going, that he used all means at hand to prevent the collision.

In support of the motion for a new trial on the ground of newly discovered evidence the plaintiff introduced affidavits of Mrs. S. F. Spurrier, Mrs. Nell Prestridge Smith and Mrs. Edna Carberry (formerly Mrs. Edna Toner) together with the affidavit of the Birmingham attorney representing the plaintiff. The defendant introduced the counter affidavit of Mrs. Nell Prestridge Smith. The substance of the affidavits is set forth as follows: The affidavit of Mrs. Spurrier which was dated November 27, 1946, states that she is a teacher at Ramsay, that she was parked just east of the east curb line of Fourteenth Street on November 11, 1941, at 6:40–45 P.M. waiting for an army convoy to cross Fourth Avenue going south on Fourteenth Street; that a number of trucks in the convoy had already crossed Fourth Avenue; that while she was waiting a streetcar came up from her rear and ran into the intersection without stopping, striking one of the trucks and turning it over; that two of the boys who were thrown from the truck appeared to be dead; that there was no break in the convoy just ahead of the truck that was struck sufficient for her to pass, the trucks being spaced at regular intervals with their lights on; that the streetcar did not appear to slow down; that she did not give her name to the police officer.

The affidavit of Mrs. Smith, which was dated November 27, 1946, shows that she works for the Zoning Board of the City of Birmingham and as to the facts is substantially similar to that of Mrs. Spurrier.

The affidavit of the plaintiff Mrs. Toner, now Mrs. Carberry, states that she was the widow of Frank T. Toner, deceased, who lost his life in a truck-streetcar accident in Birmingham, Alabama, on November 11, 1941; that she was a nonresident of Alabama and had never been a resident of Alabama and was not acquainted with anyone in the City of Birmingham, Alabama, at the time of the death of her husband; that she has never received any letters, communications, newspaper clippings or any other information from anyone in the City of Birmingham stating or indicating in any way that they were eyewitnesses to the accident; that after the accident she received a number of letters of condolence and expressions of sympathy from citizens of Birmingham, together with newspaper clippings; that she read all of these letters and clippings and none of them contained any information that any of the

parties were eyewitnesses to the accident; that all of these letters and clippings were turned over to her New York attorney at Poughkeepsie, N.Y.; that her attorney read the letters and clippings and told her that none of them revealed that any of the parties were eyewitnesses to the accident or could furnish any information that would be of service in the case; that relying upon her attorney's advice, she did not send any of the letters to her Birmingham attorney and that none of these letters were ever called to the attention of the Birmingham attorney prior to the trial of the case; that her Birmingham attorney knew nothing about any of these letters until during the trial of the case, nor did she while in Birmingham at the trial give the names of the writers of any of the letters to her Birmingham counsel as she did not recall the names of such writers at the time; that the letters were not in her possession in Birmingham when she first mentioned them to her Birmingham attorney, but in her home in New Jersey.

The counter affidavit of Mrs. Smith states that she obtained the address of Mrs. Edna Toner, widow of the soldier killed in the accident of November 11, 1941, and wrote that she had witnessed the accident and wished to express her deep sympathy; that thereafter she received a nice letter of thanks from Mrs. Toner; nothing further was heard from Mrs. Toner until the latter part of November, 1946, when a local attorney called and stated that he was representing Mrs. Toner. The attorney told her that Mrs. Toner had misplaced her name and address and had lost hope of ever locating her. The attorney further told her that in going through some personal effects Mrs. Toner found her address and forwarded it to him; that affiant gave to the attorney the name and address of Mrs. Spurrier.

The affidavit of the Birmingham attorney for the plaintiff shows in substance that he was employed in the case by Mrs. Toner in the month of May, 1943; that the several soldiers who were in the truck at the time of the accident returned to Fort McClellan, Alabama, and on, towit, December 12, 1941, were all sent to the Pacific Coast and to the various theatres of war; that Mrs. Toner came to Birmingham at the time affiant was employed and he interrogated her as to the facts in the case and the names and whereabouts of witnesses; that he was advised by Mrs. Toner that she had no knowledge of or whereabouts of witnesses and the only witnesses she knew were occupants of the truck in which deceased was riding; that she furnished him a copy of the police report which showed the names of the soldiers but did not show the names of any other witnesses; that beginning in June, 1943, he undertook to locate the several soldiers who were riding in the truck and in October, 1943, asked the Red Cross to assist him in locating the soldiers who were riding in the truck; that Capt. Servatius, who was one of the officers in the unit to which the deceased was attached, was contacted by letter in October, 1943, and requested to supply any information that he might be able to give with reference to the accident; that in due course addresses were obtained of certain of the soldiers and they were written in various theatres of war; such of the soldiers that replied gave no information that would have led to the discovery of the names of Mrs. Smith and Mrs. Spurrier and these soldiers knew nothing about the presence of these witnesses on the occasion of the accident; Capt. Servatius in his reply gave no information whatever about the facts in the case. A letter was received from Capt. Cardillo to the effect that he did not know anything about the accident until he arrived back in Anniston; that when he was assigned to make an investigation of the accident the unit was in combat and he could give no further information. In November, 1945, affiant got in touch with James M. Carberry, who informed him that he knew of no witnesses other than as shown by the police report; that prior to the trial in the last week in October, 1946, affiant went to the police department and interviewed various police officers trying to obtain facts and names and addresses of witnesses without avail; that when witnesses, the men who were riding in the truck as soldiers, came to Birmingham he inquired of them as to other witnesses but they replied that they knew of no additional witnesses; that affiant went to the scene of the accident

prior to the trial and checked for witnesses but received no information; that during the trial of the Carberry case, Mr. Carberry recalled that there was a lady who called on him while he was in the Jefferson Hospital but when this lady was contacted, it was discovered that she knew nothing; that during the trial of the case Mrs. Toner advised affiant that shortly after the death of her husband she had received letters of condolence and expressions of sympathy from citizens of Birmingham, whose names and addresses she did not remember; but that these letters, as she recalled, did not reveal any witnesses to the accident; affiant requested Mrs. Toner to forward the letters to him and on November 14, 1946, some letters were received from Mrs. Toner; one letter had been written by a Mrs. Prestridge and in this letter the writer made the remark "that her daughter was able to render certain services to your son." This letter was apparently enclosed in an envelope from the Zoning Board of the City of Birmingham, Alabama; that upon inquiry affiant determined that Mrs. Prestridge's daughter was Mrs. Nell Prestridge Smith, who worked for the zoning board. Mrs. Smith and Mrs. Spurrier were contacted and stated that they had not given their names to anyone or given any written statements as to having seen the accident; that the first knowledge or information that he had that either Mrs. Smith or Mrs. Spurrier had witnessed the accident was when he interviewed them on November 27, 1946.

In the case of Sloss-Sheffield Steel & Iron Co. v. Allred, 247 Ala. 499, 25 So.2d 179, we had occasion to consider the effect of the ordinances of the City of Birmingham regulating traffic at intersections, especially in connection with the ordinance dealing with driving through a procession. Here the procession ordinance —§ 5920 of the 1930 Code of the City of Birmingham—does not appear to be applicable because it is directed only against the operator of a "vehicle" driving through a procession and the term "vehicle" as used in the ordinance excludes a streetcar. § 5878, City Code of Birmingham of 1930. But the mere fact that there might be no violation of the procession ordinance does not change the ordinary duty which rested on the motorman as he approached the intersection which, regardless of traffic signs, was to "drive * * * at a careful and prudent speed not greater than is reasonable and proper, having due regard to the traffic, surface and width of the highway and of any other conditions then existing." Duke v. Gaines, 224 Ala. 519, 140 So. 600, 602. It seems clear to us that if there was a convoy of army trucks, with their lights on in the nighttime, spaced at regular intervals of 40 to 50 feet and moving through the intersection at a steady pace of 25 to 30 miles an hour, that such a situation would have a material bearing on the duty of the motorman of a streetcar approaching such intersection with intention to enter and cross it. The witnesses for the plaintiff on the trial of the cause on the feature of the case now under discussion were the soldiers riding in the truck, while the witnesses for the defendant were the motorman and the young women riding beside some of the trucks in the convoy. The evidence now sought to be brought into the case is different as it tends to show that there was traffic on Fourth Avenue going west which had stopped because of the line of army trucks. Mrs. Spurrier and Mrs. Smith claim to have been occupants of a car which had stopped on the east side of Fourth Avenue because they could not cross the line of regularly spaced army trucks proceeding south on Fourteenth Street. We think it undeniable that such evidence is material and not cumulative. Vol. 10, Words and Phrases, Perm.Ed. page 658. Nor when all the circumstances are considered do we think that there was a lack of reasonable diligence in discovering the evidence before conclusion of the trial. McCormack Bros. Motor Car Co. v. Arnold, 223 Ala. 504, 137 So. 288; Ohme v. Bisimanis, 222 Ala. 262, 132 So. 161. See also Fries v. Acme White Lead & Color Works, 201 Ala. 613, 79 So. 45. In arriving at this conclusion we are not unmindful of the rule in matters of this kind that much must be left to the sound judgment of the trial court. Stephens v. Pate, 221 Ala. 200, 128 So. 176; Hopkins v. Harrison, 228 Ala. 180, 153 So. 255; Williams v. Birmingham Water Works,

230 Ala. 438, 162 So. 95. And the presumption will be indulged that such judgment was exercised, unless it is obvious that the action of the court was palpably wrong. Foster v. Rosamond, 28 Ala.App. 99, 180 So. 334, cert. den. 235 Ala. 663, 180 So. 338; 5 C.J.S., Appeal and Error, § 1624, p. 533.

█ As pointed out the court did not state the ground on which it granted the motion for a new trial. Since we conclude that the court's action was justified on the ground of newly discovered evidence, its judgment should be affirmed and there is no need to discuss other grounds of the motion. American Mut. Liability Co. v. Louisville & N.R. Co., 250 Ala. 354, 34 So. 2d 474; Martin v. Birmingham Southern R. Co., 250 Ala. 583, 35 So.2d 339.

Affirmed.

BROWN, FOSTER, and LAWSON, JJ., concur.