47 So.2d 206

**LOUISVILLE & NASHVILLE R. CO. v. AMERICAN MUT. LIABILITY INS. CO.**

**6 Div. 901.**

Supreme Court of Alabama.

April 13, 1950.

Rehearing Denied June 30, 1950.

See, also, 250 Ala. 354, 34 So.2d 474.

Chas. H. Eyster, of Decatur, and Gibson & Gibson, of Birmingham, for appellant.

London & Yancey, of Birmingham, for appellee.

FOSTER, Justice.

This is a suit by the insurance carrier of the Ingalls Iron Works Company against the Louisville & Nashville Railroad Company under authority of Title 26, section 312, Code 1940. Wilmer Warren, an employee of the Ingalls Iron Works Company was killed as the result of an accident on June 26, 1942, in the course of and arising out of his employment. The Ingalls Iron Works Company and Warren were under the Workmen's Compensation Law of Alabama. The cause of his death was the operation of a switch engine and crew of the railroad serving inside the plant of the Ingalls Iron Works Company. The plaintiff as insurance carrier for Ingalls Iron Works Company paid the compensation payable to Warren's widow as his only dependent under the Workmen's Compensation Law. The railroad was an interstate carrier and the operations of the crew that

day rendered services in such commerce, which was a substantial part of its duties. It was therefore not under the Workmen's Compensation Law. Title 26, section 263, Code. Title 26, section 312, Code, has application.

The suit is for the purpose of reimbursing the plaintiff as insurance carrier and, after being reimbursed, the recovery is for the benefit of the sole dependent of deceased, his widow. The liability is dependent upon principles different from those which fix a liability under the Workmen's Compensation Law, and the measure of the liability is also different. But the nature of the suit as to its form and applicable principles is as though it were by the personal representative of Warren under the homicide statute. Title 7, section 123, Code; American Mutual Liability Ins. Co. v. Louisville & Nashville R. Co., 250 Ala. 354, 34 So.2d 474.

The suit was begun on June 2, 1943. On January 13, 1947, it was tried resulting in a verdict for plaintiff, which was set aside and a new trial granted by the circuit court. Plaintiff appealed to this Court where it was affirmed, so that it stood for trial again. This occurred on January 31, 1949, resulting in another judgment for plaintiff. After the court overruled a motion for a new trial, an appeal was taken by defendant. We are now considering that appeal.

On the former appeal this Court held that there was no error in setting aside the verdict and judgment and granting a new trial. On this appeal, we would not be troubled if the evidence were substantially the same as it was on the first trial. The rulings and charges of the court indicate that he considered that the evidence was substantially different from what it was on the first trial, and so we find it to be. The former opinion in this case gives a complete and clear statement of the occurrences and contentions. We will not repeat them, but refer to the fact that the Court thought that from the evidence the accident occurred while Warren was passing by the east end of a car marked "P. L. E." standing under a large crane tower and across the east side of an eighty foot craneway, which was connected to another car on its west and across the west side of the craneway with no opening between them. The evidence seemed to be without conflict then that at the time he was passing said east end of car P. L. E., its east end was under the east rail of the crane runway or tram and that there was an opening between said east end and a double loaded unit of two cars on its east. The Court found a great preponderance of the evidence to support the conclusion that the opening between car P. L. E. and the double loaded unit was only about fifteen to eighteen inches and not left for passage of employees or others, but only left for a few minutes pending and as a part of a switching operation. And that when the engine was pushing some cars on the east of the double loaded unit toward the west to connect with said unit to pull it out and place it elsewhere, and when the engine caused the coupling it pushed the unit some ten or twelve inches toward the west and toward car P. L. E. just at the moment Warren was passing through the opening, and crushed him causing his death.

This Court thought the trial court was justified in setting aside the verdict as against the great weight of the evidence, in that it did not properly show the breach of any duty by the railroad either in making the coupling or in respect to the passage way left between the cars, but that it showed contributory negligence of Warren in going through the space without observing the approach of the cars which were to and did couple with the two car unit, and because it did not sufficiently appear that the opening was intended for such use or invited it. The craneway was about three hundred feet long and eighty feet wide with a large crane overhead which ran along two tracks, one on the east and one on the west. It was used for loading and unloading iron and steel below. It was necessary for an employee to move along below it in the way to connect the crane with the material handled. For that purpose there was a path along the way, near its center, for the use of the employee called a "hooker," and for other employees to use when proper or convenient to do so. There was an employee called an "expeditor"

whose duty it was to see that the material in the plant was properly distributed where it was needed. He also used the hooker's path. Warren was such expeditor and was performing his duties when he was killed.

The theory on which this Court acted on former appeal was that the hooker's path was blocked by the cars P. L. E. on the east across the craneway and a Southern car on its west extending completely from east to west, and that it was obviously dangerous for Warren to pass through the narrow space of fifteen to eighteen inches between the east end of car P. L. E. and the double unit, but should have sought some other safe course. The double unit east of the crane tower blocked a roadway provided for the passage of trucks and employees in the plant.

John Walker was on that occasion the hooker and testified that he was proceeding behind Warren about thirty feet, and saw him step into the opening and in a second was hit and fell back crushed: that the opening was about three feet wide. This was the only testimony on that trial that it was so wide. The train crew all testified that it was fifteen to eighteen inches wide. Walker also testified that the cars were so situated all the morning and he had gone through it several times while performing his duties as hooker, for the path in the craneway was blocked. The railroad crew all testified that it had been there only twenty or thirty minutes in process of placing the double unit in another location. The evidence on both trials was that it was the custom to leave ample space where the craneway crosses the track for a path for the hooker and others.

On the second trial there were two witnesses not examined on the first trial, and a third since his former testimony had found a report he made which refreshed his memory. The two new witnesses were Peter Green, the overhead crane operator, who has worked for Ingalls Iron Works Company for some twenty-five years and was on duty that day, and W. H. Hadden who had been foreman for Ingalls Iron Works for about fifteen years, and Fulton was the one who found his report after the first trial. Green testified about the path-

way and the custom of leaving an opening between cars extending across it. That he sat in a box or room about one hundred feet high. That he had seen Warren about seven o'clock that morning, but not again until after the accident. He did not see the accident. (John Walker, the hooker, was the only one who did see it.) And at that time he was operating back at the shed and could not see Walker nor Warren. That when he went to work at seven o'clock that morning he saw cars under the craneway that blocked the hooker's path; that the east end of the car was under the east crane runway, and there was an opening there of about three feet. That he had seen Walker, the hooker, pass through that opening that morning, and had seen one or two other men pass through that opening that morning. That was substantially what Walker had testified by deposition on the first trial and the same deposition was used on the second trial. This conflicted in two respects with the testimony of the switching crew. They all testified that the opening was fifteen to eighteen inches and had been there only twenty to thirty minutes.

The new witness Hadden testified about the hooker's path and the custom of not blocking it. That before this accident happened he passed through the opening where Warren was killed several times that morning. He first said the opening was not in the center of the craneway, but was to the east of the center. That they made the opening in the center sometimes and at other times at the outside depending on the length of the cars. That the two cars under the craneway were connected, coupled together. That they extended all the distance across the craneway. That was the condition when he went on duty at seven o'clock that morning. That the east car extended three or four feet east of the craneway. That he distinctly remembered passing through the opening several times that morning when Warren was killed. That the cut of cars forming the opening was there before the railroad crew came in. That on numerous occasions there would be a cut of cars under or near the craneway, that they always had it cut.

The witness Fulton, safety inspector for Ingalls Iron Works for many years, had testified on former trial. He testified again as to the custom of leaving an opening at the hooker's path, and that when it was to be closed to have a flagman to warn anyone likely to be crossing. That he made an investigation and report of the accident and had attempted to find it before the first trial but was unable to do so, but did find it in the hands of counsel for the Ingalls Iron Works after that trial. That he went down and inspected the cars before they were moved after the accident. That on the west of the space where the accident occurred was Southern car No. 2871555 and on the east was P. L. E. No. 4634. That the opening was east of the center of the craneway. That P. L. E. car was hooked to a string of cars connected to an engine. That Warren was hurt between the Southern 2871555 and P. L. E. 4634. That when he got to the place of the accident the cars were so close together he would not attempt to go between them. They were about fifteen to eighteen inches apart.

The witness Roberts testified that he was chief stock clerk for Ingalls Iron Works. That he got to the place of the accident after Warren had been removed; that he saw blood between the two cars and between the rails. That he made a memorandum that morning as to the position of the cars. The double loaded unit was on track No. 1 around seven o'clock on the day of the accident, June 26th, and there. also on the next day, June 27th. This would not be at the place of the accident. The blood stains were east of the middle of the path on the east part of the craneway. The opening was just enough for a man to get through.

The defendant's evidence was substantially as it was on the former trial.

The contention of plaintiff seems to be that even if the opening was east of the east crane track or about under it, it was left that way from the day before and was' intended for a path since the hooker's path was blocked, and had been that way all the morning, although the opening might have been between car P. L. E. and the double load; that it was either east of the crane-way or that the opening was in the crane-way and between the Southern car on the west and P. L. E. car on the east and about three feet wide. That in either event Warren had a right to assume, if the jury so found, that it was open for use of employees including himself and an implied invitation to use it, and that being so it was the duty of the switching crew, according to custom in closing it, to have a flagman give warning to those who were about to use it, and that on account of the great noises about the plant and crane operations and location of the engine in pushing cars up to the double loaded unit or to the opening, it was a question for the jury as to whether Warren was negligent proximately contributing to the accident.

The court charged the jury that:

"It is for you to say from all the testimony whether there was an opening there, and if so, how big it was; it is for you to say how long it had been there; it is for you to say under the whole of the testimony, if there was an opening there, whether or not it was an opening that had been left there for the purpose of allowing men to pass through it,—that is for you to say,— and whether or not the opening was put there—whether put there for that purpose or not, was of such a nature and such a place as that employees of the Ingalls Company, if they saw it there, following their familiarity with the procedure in past days, months and years, would have been led to believe it was there for that purpose. That would be for you to say. It is for you to say whether or not, on the other hand, that the opening that was there was one which had been created only twenty or thirty minutes before, just happened to be at that particular place, and of that particular size, and whether or not it was there merely as a temporary proposition until the switching of the cars have been completed. * * *

"If you were reasonably satisfied that that opening was not one which was there for men to pass through, that it was not of such nature as to lead a reasonably prudent person to take it as being that kind of an opening, if that be true, then the court says to you if Mr. Warren came up to that place, and if he decided to pass through it,

it would be his duty, before stepping into it, to stop and to look and to listen at such time and at such place and in such position that he could see whether or not there was any moving train upon the tracks which would be likely to interfere with his safe passing through there.

"On the other hand, if there was an opening there which had been placed there for men to pass through in going about their work, or if the opening was of such a kind and such a nature, and in such a place, as to lead reasonable persons there on the premises doing work to believe it was there for that purpose, and if these facts were known to the employees of the L & N Railroad Company, and were observable by them, and if they, in the exercise of reasonable care, would have observed that there was such an opening, that it was of such a kind and nature, and in such a place as to lead reasonable employees to think it was the usual opening for them to pass through—if those things be true, and if you are reasonably satisfied that there had been a custom established in times past and past years of not closing such an opening without having present there at the place an employee to warn those who were coming through there,—if you were reasonably satisfied that is true,—then, of course, in such a case as that it would be the duty of those in charge of the train to use reasonable care in seeing that the situation was reasonably safe before closing the opening, if that were true.

"I might say to you, gentlemen, if this latter situation was the truth,—that is for you to say,—then the employee himself, if he came to a place which had been left there for the purpose of having employees go across there, and if it were true that custom had been established in past months not to close off a place without having somebody come up there and give warning, if that were true and he knew it, then, of course, he would have a right to act on that assumption in going into it and in crossing across. * * *

"I have already said to you under certain conditions it would be his duty to stop, look and listen, and I will not repeat that, but under those conditions the law would say to Mr. Warren, under any of these conditions, if he came to the track and started to cross it, under all these conditions it would be his duty to handle the situation as would a reasonably prudent person under the same or similar circumstances."

### Affirmative Charge

Assignments 1, 2, 3, 13 and 16 are for the refusal of the affirmative charge requested in various forms.

The switching crew was composed of five men, McQuaid, the crew foreman; Glover, the engineer; Biddings, the fireman; Beavers and Smith, the switchmen. The court charged that none of them were negligent, except that the jury were at liberty to find that McQuaid, the foreman, was negligent. He had charge of the operation. The jury could find that from the evidence. Warren was injured in closing an opening between cars involved in the operation. McQuaid was on the north side where the entire movement and status was open to his observation. The jury were privileged to find from the evidence that the opening was three feet; that there was no other opening available at the time; that Warren, the expeditor, had duties which carried him north of the cars requiring passage somewhere. The roadway east of the craneway was blocked by the double car unit. It was a long distance to go around either end; it was customary to leave a space either in the craneway or east of it for that purpose. That there was an implied invitation to employees having duties to perform to pass through this opening; that the opening was customarily flagged when being closed; that it was not flagged on this occasion; that the opening was wide enough and so situated as to be useful for employees to pass, and presumably not dangerous to do so when not flagged; that the opening was closed without flagging it, all under the observation of McQuaid. From those facts, which the jury could find from evidence of substantial weight to have occurred, they could reasonably draw the conclusion that McQuaid was negligent in not flagging the crossing when it was being closed. Louisville & Nashville R. Co. v. Williams, 183 Ala. 138, 147, 148, 149, 62 So. 679, Ann.Cas. 1915D, 483.

■ And as to contributory negligence, the jury could find from those facts as a reasonable conclusion that the opening through which Warren passed, was left as an invitation to him to use in crossing and to assure him that it was reasonably safe for him to use it without being sure that it was then not in danger of being closed because it was not being flagged; and with that assurance it was for the jury to say whether he was negligent in not discovering the cars approaching at a slow speed in the midst of extreme noises in the immediate vicinity from the use of the crane and other appliances.

Appellant's contention is that there was no custom or duty to flag this opening since the movement consisted only of connecting cars to the double unit on its east, whereas the opening was west of that double unit. But that contention ignores the theory and tendencies of the evidence that the opening was three feet wide, left for passage of employees and used as such by them, and the only passageway across track No. 3, and that the coupling thus made had a tendency to push the double unit west and close the opening at a time when an employee was probably using the opening.

That is a theory which the trial court submitted to the jury in his oral charge. Appellant excepted to it, but we think it correctly states the law and that there was substantial evidence to support it. We are not sure that appellant's contention is the better view. But if it is, of course, that would not justify the affirmative charge, nor that alone be sufficient to reverse the trial court in overruling the motion for a new trial.

■ The rule of law is applicable that when there is an express or implied invitation by the railroad to one to cross its track at a particular place and time, the requirement that he stop, look and listen is not absolute, and whether such failure is negligence is dependent upon all the circumstances considered together. Louisville & Nashville R. Co. v. Richards, 100 Ala. 365, 13 So. 944; Alabama Great Southern R. Co. v. Anderson, 109 Ala. 299, 19 So. 516; Louisville & Nashville R. Co. v. Williams, 199 Ala. 453, 74 So. 382, 383(3); Birmingham Southern R. Co. v. Harrison, 203 Ala. 284(11), 82 So.534; Cunningham Hardware Co. v. Louisville & Nashville R. Co., 209 Ala. 327(12), (14), 96 So. 358; Louisville & Nashville R. Co. v. Cunningham Hardware Co., 213 Ala. 252(14), 104 So. 433.

The case of Louisville & Nashville R. Co. v. Williams, 172 Ala. 560, 55 So. 218, and the authorities there cited, refer to one making a crossing without any sort of invitation from the railroad, express or implied.

## Assignments 38 and 39.
### Ruling on motion for a new trial.

Plaintiff's (appellee's) contention and theory were much better supported on the second trial than on the first. It was then supported by John Walker alone. (His name is erroneously stated at one place in the former opinion as "George" Walker. But there was only one such man and that was John, the hooker.) On the second trial it was supported by Green, Hadden and Fulton who was using his memorandum. We are not willing to hold that the great weight of the evidence was so contrary to the verdict finding for plaintiff as to justify us in holding that the judge who conducted the trial was wrong in overruling the motion for a new trial.

We are much impressed with the able, clear and accurate charge of the court covering every aspect of the case.

There were some rulings on evidence to which exceptions were taken. We have examined them but do not find reversible error in any of them.

The only other question insisted on is that the amount of the verdict was excessive.

As we have said, that matter is controlled by our homicide statute, where the damages are punitive only. This was carefully and correctly explained by the trial judge in his oral charge, and we do not think there was probably any confusion as to that in the mind of the jury. We do not think the amount of the verdict was so excessive as to justify us either in setting it aside or requiring a remittitur.

134

Upon the basis of the foregoing discussion, the judgment must be affirmed.

Affirmed.

BROWN, LAWSON and STAKELY, JJ., concur.